AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| GEOFFREY SCOTT CARTER, and | ) | Case No.  3:22-mj-**1467-PDB** |
| ~~TENTON~~ KNIGHT | ) | |
| TRENTON | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ October 18, 2022 _____ in the county of _____ Duval _____ in the

_____ Middle _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1) and (b)(1)(B) | Distributing, and aiding and abetting the distribution of, 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine. |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Richard M. Thurmond, Task Force Officer, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  10/31/2022

_____
*Judge's signature*

City and state:  _____ Jacksonville, Florda _____

Patricia D. Barksdale, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

1.      This affidavit is offered in support of an application for a search warrant

authorizing a search of 6768 Daughtry Blvd. South, Jacksonville, Florida (Target

Location 1) and a criminal complaint charging Geoffrey Scott CARTER and

Trenton KNIGHT with distributing, and aiding and abetting the distribution of,

controlled substances, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1).

### Background of the Affiant

2.      I have been a law enforcement officer for the past twenty years, and

have been full time Deputy Sheriff of the St. Johns County Sheriff's Office since

2002.  Since 2016, I have been assigned as a Detective to the Special Investigations

Unit (SIU), which specializes in narcotics related investigations.  As of June 2021, I

have been assigned to the Drug Enforcement Administration, U. S. Department of

Justice, in the Jacksonville District Office as a full time Task Force Officer (TFO).

Along with narcotics investigations, I am a member of the DEA SRT team, which

specializes in the execution of search warrants and high risk narcotics arrests.

3.      In addition to attending the Police Academy in compliance with

Florida Police Standards, I have attended numerous law enforcement schools,

including basic and advanced level law enforcement narcotic course, such as

Advanced Undercover Techniques and Survival, Advanced Undercover Academy,

Rachel's Law, Basic Clandestine Lab Safety, Dark Web Investigations, Fentanyl Safety

for Law Enforcement Officers, Opioid Overdose Death Investigations, the DEA Task

Force Officer Academy, and numerous other DEA courses.

4.      I have participated in investigations involving the unlawful use, possession, and distribution of controlled substances and the unlawful possession of firearms. I have been the case agent associated with the execution of numerous search warrants and have assisted in the execution of hundreds search warrants. I have been involved in hundreds of drug investigations, which have resulted in numerous arrests. I have posed as a drug buyer, assisted in a wiretap investigation, conducted surveillance on suspected narcotics residences and violators, have written numerous search warrants (State and Federal), and have handled numerous confidential informants/sources. I have directed numerous confidential informants to successfully infiltrate various narcotics enterprises through intelligence gathering, participation in consensual recordings and controlled purchases of illegal drugs. I am familiar with the method of operation of drug buyers and sellers, and with the "slang" or coded language used to describe drug transactions. I have also conducted investigations involving the identification of co-conspirators through the use of telephone records and bills, drug ledgers, photographs, and other documents. I have participated in the debriefings of many arrested individuals who later cooperated with law enforcement.

### Application

5.      In the course of my duties as a Task Force Officer of the DEA, I have been investigating the unlawful possession and trafficking of controlled substances by

2

Geoffrey Scott CARTER and Trenton KNIGHT. This affidavit relates to that investigation and is made in support of a criminal complaint and an application for a search warrant authorizing the search the property located at 6768 Daughtry Blvd. S, Jacksonville, Florida (Target Location 1), which is more particularly described in Attachment A, to seize items more particularly described in Attachment B.

6.      This Affidavit is based upon my personal knowledge, but also information I have gained through training and experience, as well as information related to me by other individuals, including law enforcement officers. Since this affidavit is being submitted for the limited purpose of securing a search warrant and in support of a criminal complaint, I have not included each and every fact known concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that CARTER and KNIGHT have distributed, and aided and abetted the distribution of, controlled substances, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1), and that evidence relating to the controlled substance offenses will be located at Target Location 1.

### August 5 Traffic Stop

7.      The following paragraphs describe a traffic stop in St. Johns County of a vehicle in which Geoffrey Scott CARTER was the passenger. I have learned about that event based on my personal observations of the evidence seized during the traffic stop; interviews with Saint Johns County Sheriff's Office Deputy Jason Green and

3

Deputy Ellis, and Saint Augustine Beach Police Officer Cline; and my review of
Deputy Green's and Officer Cline's reports.

8.     On August 5, 2022, Deputy Green observed a white 2021 Kia SUV,
travelling southbound on Avenida Menendez, drift over the double solid middle lane
divider on three separate occasions. According to his report, Green conducted a
computer check of the Kia SUV's Florida Tag 23AVRR and a check of the registered
owner's driver's license. The registered owner of the Kia was "Person A." The
computer check revealed that Person A's license was suspended. Deputy Green
observed the operator of the Kia SUV to be a white female driver, which matched
Person A's description. Deputy Green activated his emergency lights and executed
the traffic stop.

9.     Once at the front driver's window of the Kia SUV, Deputy Green
confirmed that the operator of the Kia was Person A. Person A informed Deputy
Green that she knew her driver's license was suspended. While speaking with
Person A, a white male front passenger handed Deputy Green his Florida
identification card. The white male was identified as Geoffrey Scott CARTER.
CARTER also had a suspended or revoked driver's license at the time of this traffic
stop. Deputy Green observed a secured black box on the driver-side rear floorboard,
which had two master locks attached to it, as well as a large duffle bag on the
passenger-side rear seat.

4

10.    A computer check of CARTER revealed he was a convicted felon, a gang member, and a drug violator.  Deputy Green asked via radio for a narcotics K9 to respond to his location to conduct an open air sniff of the vehicle.  In the meantime, Green worked on completing the citation for Person A for driving while license suspended or revoked.  Minutes later, Officer Bruce Cline and his K9 Kilo, from the St Augustine Beach Police Department, arrived on scene.  According to his report, Officer Cline approached the Kia SUV and asked the driver (Person A) to exit the vehicle.  As Person A was exiting the vehicle, Officer Cline informed Person A that he was going to conduct an open air sniff of the vehicle and asked if she had a valid medical marijuana card.  Person A stated, no.

11.    According to his report, Officer Cline then asked the passenger (CARTER) to exit the vehicle so he could conduct the open air sniff of the vehicle.  CARTER exited the vehicle, but became verbally belligerent towards Officer Cline who recognized CARTER from a prior gun and drug investigation.  Due to CARTER's aggression towards Officer Cline and knowing that he was a convicted felon, Office Cline conducted a pat down for weapons of CARTER's person.  The pat down revealed brass knuckles in CARTER's right front pocket.  The brass knuckles were removed from CARTER's person.

12.    Officer Cline then conducted the open air sniff with K9 Kilo.  K9 Kilo gave a positive alert, indicating the presence of illegal narcotics.  Once a positive alert

5

was given by K9 Kilo, CARTER was detained and again patted down, this time by Deputy Green. Green located an empty brown leather handgun holster, which was located on CARTER's inner beltline. When the holster was located, CARTER stated it was to hold his cigarettes.

13.    Officer Cline searched the vehicle. The search revealed as follows:

 a.  Front passenger door compartment – a key FOB with keys attached that opened to master locks affixed to a black case.

 b.  Rear passenger floorboard - black case with master locks contained the following:

  i.  Silver North American Arms Guardian .32 ACP handgun, loaded with one round in the chamber and six rounds of ammunition in the magazine.

  ii.  Black Ruger EC9 handgun, loaded with one round in the chamber and five rounds of ammunition in the magazine. A database check of the firearm revealed that it had been previously reported stolen.

  iii.  Black zipper pouch containing 7 smaller bags of various amounts of white powdery substance. The white powdery substance field-tested positive for the presence of cocaine and had a total weight of approximately 21.38 grams.

6

c. Rear passenger seat area – black duffle bag contained the following:

    i.    Black box containing a zipper pouch with a digital scale and two empty narcotic baggies.

    ii.    Plastic container with multicolored pills in plastic baggies. These pills field tested positive for the presence of MDMA with a total weight of approximately 3.63 grams.

    iii.    Seven baggies and one plastic container which all contained a various amount of crystal like substance. The crystal like substance field tested positive for the presence of methamphetamine with a total weight of approximately 36 grams

    iv.    Plastic bottle containing raw marijuana in plastic baggies with a total weight of approximately 3.87 grams.

    v.    Several items of drug paraphernalia were located inside the duffle bag, including two digital scale lids with white powder residue, a Walmart card that appeared suitable for cutting the narcotics, an orange spoon with white powdery residue, and several index cards with residue.

    vi.    Five used syringes were also located inside the black duffle

bag.

14.     According to his report, Deputy Green read Person A her *Miranda*

rights.  Person A stated she understood her rights and agreed to speak with Deputy

Green.  Person A stated she and CARTER were travelling from their residence in

Jacksonville (6768 Daughtry Blvd. S, *i.e.* Target Location 1) to St. Augustine to find

a hotel.  Person A stated the black duffle bag and the black box with the master locks

did not belong to her and that she observed CARTER place the duffle bag into the

Kia SUV earlier in the day.  Person A stated while at their residence in Jacksonville,

she observed CARTER with the two black boxes that matched the two black boxes

located inside the vehicle during the search.  Person A stated she gave the Key FOB

to CARTER earlier in the day, but it did not contain any key when she gave it to

him.  Person A stated she was unaware of the illegal narcotics being present in the

vehicle, but was aware of CARTER selling illegal narcotics.

15.     Due to the statements made by Person A and evidence found at the

scene, Person A was released at the scene and CARTER was arrested and charged

with:

> a.  Trafficking 28 grams or more Methamphetamine;
>
> b.  Possession of Cocaine with intent to sell;
>
> c.  Possession of MDMA with intent to sell;
>
> d.  Possession of Marijuana with intent to sell;

8

e.  Possession of Drug Paraphernalia;

f.  Possession of a Weapon by a Convicted Felon;

g.  Possession of a Weapon by a Convicted Felon;

h.  Possession of Ammunition by a Convicted Felon; and

i.  Grand Theft of a Firearm.

16.    Based on my review of the court docket entries, I know that following his August 5 arrest, CARTER was released after posting bond on August 9, 2022.

### October 13 Controlled Buy

17.    Beginning on October 13, 2022, working with me in an undercover capacity, St. Johns County Confidential Informant SIU-22-015 (the CS) made a series of purchases of illegal narcotics and a firearm from Geoffrey Scott CARTER within the residence at 6768 Daughtry Blvd. S, Jacksonville, FL, that is, Target Location 1.  Florida Department of Highway Safety and Motor Vehicles records show that Person A lives at Target Location 1, but according to the CS, CARTER also lives there.  Further, according to the CS, CARTER and the CS had engaged in drug transactions in the past.  The CS has prior convictions in the State of Florida for Possession of Synthetic Cannabinoids and Fraudulent Use of Credit Cards, and prior convictions in Massachusetts for Conspiracy to Distribute Oxycodone and Drug Trafficking.  The CS is currently cooperating with law enforcement for assistance/consideration with the State Attorney Office for the Seventh Judicial

9

Circuit.

18.     The following paragraphs describe information that I know based on my personal observations acting as the undercover, interviews with the CS, conversations with other investigators, and watching the undercover recorded videos. On October 13, 2022, at approximately 11:30 a.m., Detective J. Ackerman (St. Johns County Sheriff's Office) and I met with the CS with the intention of making a controlled purchase of controlled substances from CARTER. The undercover vehicle that was to be used for the operation was search for contraband and none was found. I searched the CS for currency and contraband, and found none. The CS and I were both fitted with covert electronic transmitting/recording devices, which allowed surveillance units to actively monitor the ensuing transaction.

19.     At approximately 11:45 a.m., surveillance was established in and around 6768 Daughtry Blvd. S, Jacksonville, Florida (Target Location 1), which according to the CS, is CARTER's residence. According to Special Agent Kyle Keenan, he observed in the driveway of the residence a white Kia sport utility vehicle bearing Florida license plate 23AVRR, that is, the same vehicle that was stopped on August 5 and found to contain drugs and guns. At approximately 11:57 a.m., DEA TFO Troy Yorton observed the white Kia leave the residence.

20.     At approximately 12:04 p.m., the CS made a controlled call to CARTER, using a number the CS believed to be CARTER's (904-576-8403). During

10

the call, CARTER stated he had to go get the crystal methamphetamine from around

the corner and would return in 10-15 minutes. The entire call was captured on an

electronic listening device (ELD). At approximately 12:13 p.m., the CS and I arrived

at CARTER's residence to wait for his to return.

21.     At approximately 12:19 p.m., the CS made another controlled call to

CARTER (again calling 904-576-8403). Carter stated he was on his way back and

had a little shy of four. With my training and experience, I understood that he meant

he was bringing back just under four ounces of crystal methamphetamine. Again, the

entire call was captured on an ELD.

22.     At approximately 12:26 p.m., I saw CARTER arrive at Target Location

1, operating the white Kia SUV. The CS approached CARTER at the Kia SUV and

both CARTER and the CS entered the residence. Based on my interview of the CS

and review of the undercover recording, I have learned that while inside, the CS and

CARTER began discussing the narcotics deal. CARTER weighed out approximately

three ounces of crystal methamphetamine on a digital scale and the CS provided him

with $800 in DEA supplied funds.

23.     The undercover recording of the transaction shows that on CARTER's

right hip, there was a large bulge. Through my training and experience with carrying

concealed weapons and identifying people carrying concealed firearms, I believe that

CARTER was armed with a handgun. The recording also captured CARTER

11

discussing his wish to purchase more firearms from an unknown subject at a later date. I know that CARTER is a convicted felon and at the time of this drug transaction, he was out on bond for multiple drug trafficking charges and weapons offenses.

24.    At the conclusion of the narcotics transaction, the CS thanked CARTER, left the residence with the crystal methamphetamine, and returned to the UC vehicle where I was waiting. I took from the CS the crystal methamphetamine and $200 in excess DEA-supplied funds.

25.    Once at the debriefing location, the CS and I met with members of the surveillance/cover team. Detective Ackerman retrieved the covert transmitting/recording devices from the CS and me, and maintained custody of them until giving them to me on October 18, 2022. I then downloaded the recordings onto a CD, which has been preserved as evidence.

26.    The crystal methamphetamine that CARTER sold, including the bag it was delivered in, has been weighed on an uncertified scale, which showed a weight of 114.2 grams. I have field tested the methamphetamine and observed a positive test for the presence of methamphetamine. As witnessed by Special Agent Keenan, I packaged that evidence and shipped it to a DEA Chemical Laboratory for analysis.

## October 18 Controlled Buy

27.     The following paragraphs describe information that I have learned about an undercover operation based on my personal observations acting as the undercover agent, interviews with the CS, conversations with other investigators, and watching the undercover recorded videos.  On October 18, 2022, at approximately 11:00 a.m., Detective J. Wilson (St Johns County Sheriff's Office) and I met with the CS with the intention of making another controlled purchase from CARTER at Target Location 1.  Again, the undercover vehicle that was to be used for the operation was search for contraband and none was found.  I searched the CS for currency and contraband, and found none.  The CS and I were both fitted with covert electronic transmitting/recording devices, which allowed surveillance units to actively monitor the ensuing transaction.

28.     At approximately 11:15 a.m., surveillance was established in and around Target Location 1.  The CS placed several controlled phone calls to CARTER, but CARTER's phone went straight to voicemail or showed "busy."  At approximately 11:33 a.m., the CS and I arrived at Target Location 1.  The CS exited the UC vehicle and attempted to make contact with CARTER at the front door.  Moments later, CARTER opened the door and allowed the CS to enter the residence.

13

29.     Based on my interview with the CS and review of the undercover recording, I have learned that once inside, CARTER and the CS began discussing the narcotic transaction.  CARTER made several phone calls with the CS's phone because CARTER's phone was out of service.  CARTER stated to the CS he needed to add minutes to his phone and previously was unaware it was out of service. CARTER first called Person A (the CS' call history showing that he dialed 904-424-0247) and directed her to call Trenton KNIGHT and tell him to come to the house now with the methamphetamine.  I have observed from the undercover video recording that, while CARTER was on the phone with Person A, there is clearly a black semiautomatic handgun in the beltline of CARTER's pants.

30.     After hanging up with Person A, CARTER told the CS to dial KNIGHT's phone number (904-649-9672, again as recorded in the CS' call history). CARTER told the CS not to try to call KNIGHT any other time or they would both be cut off.  Through my training and experience, I understand that this comment meant that KNIGHT is the source of supply for CARTER who did not want the CS to cut him out of future deals by going directly to KNIGHT to buy methamphetamine.  The CS told CARTER he wouldn't call KNIGHT and dialed the phone.  During the call on the CS's phone, CARTER told KNIGHT that he needed to hurry up because the CS had to leave and they would both lose out on this deal.  CARTER called KNIGHT for the second time and asked if KNIGHT had left

14

his residence yet.  CARTER asked if KNIGHT wanted Person A to come by and

grab the methamphetamine from KNIGHT.  KNIGHT stated he would be bringing

it shortly.

31.    While waiting for KNIGHT, CARTER and the CS discussed fentanyl

that CARTER had on hand.  CARTER stated prices, how to ingest it, the makeup of

the fentanyl, and that he had approximately a quarter pound of fentanyl available.

CARTER stated to the CS that everyone that's doing it is fallen out.  Through my

training and experience, I understood this comment to mean that the person

ingesting the fentanyl is either (i) becoming extremely high and passing out or (ii)

overdosing on the fentanyl.  I know that without medical intervention, the people

who overdose (or "OD") on fentanyl typically die.  The CS stated he/she had seen

videos of people ingesting "Benzo Dope."  The CS described it as fentanyl with an

unknown benzodiazepine that the cartels are making now.  The CS stated people

have been OD'ing and dying off of one hit of the "Benzo Dope".  Referring to the

fentanyl that he had on hand, CARTER responded that might be what that shit is

then.  CARTER offered the CS some of the fentanyl to use while they waited, but

the CS refused.  Person A entered the room and joined into the conversation about

narcotics.

32.    CARTER then attempted to call KNIGHT to see where he was, but the

phone calls were met with negative results.  Person A stated, "I texted him

15

[KNIGHT] and told him 11:30/11:45ish". CARTER then handed the CS approximately one gram of crack cocaine that he had for sale. He then began to explain how he turns the powder cocaine into crack cocaine inside his residence.

33.    While sitting outside in the UC truck, I observed a white, single-cab Chevy truck with Florida tag RUNS0NE pull up into the yard of CARTER's residence. I saw a white male driver wearing a black hat, red hoodie sweatshirt and black shorts and identified him immediately as Trenton KNIGHT from prior law enforcement contacts with him in St. Johns County. KNIGHT also had a small dog with him. I then saw CARTER exited his residence wearing only a pair of black sweat pants. I was able to observe clearly a semiautomatic handgun in the belt line of CARTER's sweat pants. CARTER met with KNIGHT at the truck and told KNIGHT to come inside. As CARTER began to jog back towards the residence from the truck, I saw the semiautomatic handgun come out of CARTER's beltline and fall to the ground. CARTER, realizing it fell, turned around, jogged back to the semiautomatic handgun on the ground, picked it up, looked at me, laughed, and jogged back into the residence, that is, Target Location 1. KNIGHT followed CARTER into the residence with the small dog.

34.    While waiting for CARTER and KNIGHT to enter the residence, the CS and Person A stayed inside the same room that CARTER had left them in. The

16

undercover recording captured them engaging in small talk and Person A ingesting an unknown type narcotic through a glass smoking device.

35.     Once CARTER and KNIGHT were inside, CARTER called the CS to come to a different room. According to the CS, when the CS entered the room where CARTER and KNIGHT were located, the CS observed KNIGHT holding approximately eight ounces of methamphetamine in multiple bags. The CS has told me that KNIGHT handed CARTER the methamphetamine and CARTER began emptying each bag on a scale to be weighed. In between weighing each bag, CARTER handed the methamphetamine to KNIGHT to be repackaged. KNIGHT held onto all of the methamphetamine bags until they had been weighed. According to the CS, KNIGHT then handed all the methamphetamine bags to CARTER to show the CS total weight. After CARTER weighed all the bags, CARTER handed the methamphetamine to the CS. The CS then handed CARTER the $2,200.00 in DEA-provided funds. The undercover recording of the transaction did not capture video images of CARTER and KNIGHT handling and weighing the methamphetamine, but it does include clear images of CARTER counting on a bed the $2,200.00 that the CS had paid him for the drugs.

36.     While CARTER was weighing and packaging methamphetamine, the CS began to inquire about handguns. CARTER stated he had a Ruger .380 for sale for approximately $200. CARTER advised the Ruger holds six rounds with one in

17

the chamber. CARTER stated that he also has seven special bullets for it. Carter

informed the CS that the "special bullets" had military grade primers and gunpowder

and have been modified to punch through bulletproof vests. The CS thanked

CARTER and CARTER asked the CS when would the CS be ready to do another

deal. The CS replied that he/she would be ready for another purchase in a few days.

CARTER asked the CS to give him a call a day in advanced so he would be ready.

The CS agreed and left the residence.

37.    Once back at the UC vehicle, I took from the CS possession of the

methamphetamine and the crack cocaine supplied by CARTER. We left the scene

and proceeded to DEA's offices.

38.    After the operation, the CS and I met with DEA TFO Sullivan and

Detective Wilson. Detective Wilson retrieved the covert transmitting/recording

devices from the CS and me, and maintained custody of them until giving them to

me on October 24, 2022. I then downloaded the recordings onto a CD and viewed

them.

39.    Also after the October 18 operation, I weighed the methamphetamine

supplied by CARTER, including the bag it was delivered in. On an uncertified scale,

it weighed 236.2 grams. As witnessed by TFO Sullivan, I field tested the

methamphetamine and observed a positive test for the presence of

methamphetamine. Both the methamphetamine and suspected crack cocaine

18

supplied by CARTER packaged and shipped a DEA Chemical Laboratory for analysis.

40.    I have reviewed telephone toll records associated with the cellphone used by CARTER (904-576-8403) to see if he communicates regularly with the phone used by KNIGHT (904-649-9672). Between September 11 and October 11, 2022, the phone tolls showed that CARTER and KNIGHT communicated 162 times via cellphone calls and text messages. The cellphone account that CARTER uses is not in his name.

### October 20 Controlled Buy

41.    The following paragraphs describe information that I have learned about an undercover operation based on my personal observations acting as the undercover agent, interviews with the CS, conversations with other investigators, my review of reports prepared by ATF Special Agent Mallory Sonn, and watching the undercover recorded videos. On October 20, 2022, at approximately 10:15 a.m., I met with the CS, Detective Wilson, and SA Sonn with the intention of purchasing a firearm and drugs from CARTER at Location 1. Again, the undercover vehicle that was to be used for the operation was search for contraband and none was found. I searched the CS for currency and contraband, and found none. The CS and I were both fitted with covert electronic transmitting/recording devices, which allowed surveillance units to actively monitor the ensuing transaction.

19

42.     At approximately 10:45 a.m., ATF SAs established surveillance in and around Target Location 1.

43.     While enroute to Target Location 1, I witnessed the CS attempt to call CARTER several times, but CARTER did not answer the calls.  At approximately 11:08 a.m., the CS and I arrived at Target Location 1.  The CS exited the UC vehicle and attempted to make contact with CARTER at the front door.  At approximately 11:11 a.m., CARTER answered the door and allowed the CS to enter the residence.

44.     Based on my interview with the CS and review of the undercover recording, I have learned that, once inside, CARTER and the CS began discussing the firearm transaction.  CARTER started showing the CS several different firearms he had in the residence.  During the conversation, the CS asked the price of a firearm that CARTER was showing the CS.  CARTER stated that it was worth about six [meaning $600] but he could not obtain that much for it because he did not have a license to sell and was a felon.  Ultimately, CARTER agreed to sell the CS a Colt revolver with ammunition for $250.  He also agreed to sell 3.5 grams of fentanyl to the CS for $280.  The undercover recording shows CARTER holding the firearm that he sold to the CS and the narcotics transaction.  After receiving the firearm and drugs, the CS thanked CARTER and exited the residence and returned to the UC vehicle.

45.      Once at the UC vehicle, I took possession of the firearm, the fentanyl and $60.00 in excess ATF-supplied funds that the CS had not spent with CARTER. The CS and I then drove back to the ATF Office for a debriefing.

46.      Once at the ATF Office, I transferred the firearm to SA Sonn. Detective Wilson retrieved the covert transmitting/recording devices from the CS and me and provided the recordings to SA Sonn who has preserved them as evidence. I initially maintained custody of the fentanyl, but later turned it over to DEA TFO Palecek and SA Keenan to process. TFO Palecek weighed the fentanyl on an uncertified scale. The Fentanyl weighed approximately 3.5 grams with packaging. For safety reasons, the fentanyl was not field tested. TFO Palecek packaged the fentanyl and sent it to the DEA Chemical Laboratory for further chemical testing.

47.      I have reviewed CARTER's National Crime Information Center (NCIC) criminal history and observed that CARTER has eight prior felony convictions including, among others, Escape from a Detention Facility; Possession with Intent to Sell Methamphetamine; Manufacturing Methamphetamine; Possession of Listed Chemicals to Manufacture Methamphetamine; and Trafficking in Methamphetamine.

48.      I have reviewed KNIGHT's NCIC criminal history and observed that KNIGHT has eleven prior felony convictions in the State of Florida, including Burglary; Burglary of an Occupied Dwelling (multiple convictions); Armed Burglary

21

with Assault or Battery; Grand Theft (multiple convictions); Burglary of an Unoccupied Structure or Conveyance; Grand Theft Motor Vehicle; and Sale of a Schedule II Substance.  KNIGHT's criminal history also includes convictions in the State of North Carolina for Felony Larceny; Larceny after Breaking and Entering; Identity Theft; and Identity Fraud.

49.    A search through law enforcement databases revealed that both CARTER and KNIGHT were members of the same white supremacy gang/brotherhood, which is known as "Unforgiven."

50.    Based on my training and experience and consultations with fellow law enforcement officers, I know that narcotics traffickers keep on hand U.S. currency in order to maintain and finance their on-going narcotics business.  They often maintain books, records, receipts, notes, ledgers, money orders, and other papers relating to the transportation, receipts, sale and distribution of controlled substances.  Such documents typically are maintained where traffickers have ready access to them -- frequently at their residences, stash houses, businesses, or within their automobiles.  I also know that persons involved in narcotics trafficking frequently conceal in their residences, stash houses, businesses, or within their automobiles caches of drugs, scales, drug packaging materials, cutting agents and diluents, large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions; and the evidence of financial transactions

22

relating to obtaining, transferring, secreting or spending of sums of money made from narcotics trafficking activities. In my experience, narcotic traffickers commonly maintain addresses or telephone numbers in books, papers, or cellular telephones, which reflect names, addresses and/or telephone numbers of their clients and associates in the drug trafficking organization.

51.    Therefore, based upon the foregoing, I respectfully submit that there is probable cause to believe that Geoffrey CARTER and Trenton KNIGHT have distributed, and aided and abetted the distribution of, controlled substances, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). Further, there is probable cause to believe that the evidence described in Attachment B will be located at Target Location 1, which is more particularly described in Attachment A.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Richard M. Thurmond
Task Force Officer
DEA

Sworn to before me this
31st day of October, 2022

Patricia D. Barksdale
United States Magistrate Judge

23